UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

DAREN MAAS                                              Index No. 23-cv-04147 (VSB)

                                    Plaintiff,          **PLAINTIFF'S RESPONSE
                                                        TO DEFENDANT'S**
                   -against-                            **LOCAL FULE 56.1
                                                        STATEMENT OF**
VERIZON NEW YORK, INC.,                                 **UNDISPUTED FACTS**

                                    Defendant.

----------------------------------------------------------------------X

Plaintiff Daren Maas asserts, pursuant to Rule 56.1 of the Local Civil Rules of the United

States District Court for the Southern District of New York, that the following facts are in dispute

requiring a trial of this matter:

**A.      Background of Employment**

*Defendant's Statement of Fact No. 1*

*Plaintiff Daren Maas ("Maas") began his employment as a Field Technician with
Verizon on or about March 31, 1997 , and he remained in that role until his employment
was terminated effective January 20, 2020.  (Wexler Decl., Ex. M.)*

**Plaintiff's Response**
Admitted.

*Defendant's Statement of Fact No. 2*

*As a Field Technician, Maas worked in the field providing network access to residential
and business customers. Specifically, he did this by connecting, disconnecting, and
repairing Company and customer-provided telephones and equipment, inside wiring, and
wires at poles, underground, and in building terminals.  (Wexler Decl., Ex. N.)*

**Plaintiff's Response**
Admitted.

*Defendant's Statement of Fact No. 3*

*During the Relevant Time Period.  Maas was a Lineman, which is a category of Field
Technician.  (Cimaglia Tr. 28:19-22, 32:06-13; 66:21-23.)*

**Plaintiff's Response**
Admitted.

***Defendant's Statement of Fact No. 4***
*Verizon maintains a written job description for Field Technicians outlining the required duties for the position, which include (and has included during all relevant times during Maas's employment with Verizon) but are not limited to: "laying or removing cable and conduit"; "placing and climbing poles, pulling and stringing cable"; "working in tunnels, buildings, trenches, manholes, etc. with heavy equipment, e.g., trenches, Bolins plows, etc."; "pulling wires and cables through ducts by hand or by winch"; "splicing a variety of cables in various environments – aerial, underground, buried, submarine, buildings, etc."; "using light to very heavy equipment"; "using ladders and climbing poles"; "works indoors and outdoors in all kinds of weather"; "[c]limbs ladders or poles and works aloft for long periods of time using tools ... where pole climbing is required, a candidate must meet the course qualification standard"; "[m]ay be required to perform additional duties and tasks as required by the Company." (Wexler Decl., Ex. N.)*

**Plaintff's Response**
Admitted.

B.    **Verizon Policies**

***Defendant's Statement of Fact No. 5***
*During Maas's employment with Verizon, Verizon maintained an"Equal Employment Opportunity / Affirmative Action Policy" that prohibited unlawful discrimination and harassment due to any protected characteristics (including disability), prohibited retaliation, and addressed reasonable accommodations.  Maas was aware of this policy while he was employed by Verizon. (Wexler Decl., Ex. O; Maas. Tr., 83:11-15.)*

**Plaintiff's Response**
Admitted in part, during deposition Maas admits to being aware of a policy, but when shown EEO policy he stated he was not familiar with the document.  In response to "[a]re you familiar with this document?," he stated, "[n]ot really."  (See, Maas Tr. 83:16-21.)

***Defendant's Statement of Fact No. 6***
*During Maas's employment with Verizon, Verizon maintained an "American With Disabilities Act (ADA) Policy" that prohibited discrimination, addressed reasonable accommodations, provided contact information and methods to report any violations, stated" "Ther Workplace Accommodation team is responsible for providing guidance*

*regarding whether a reasonable accommodation is needed and appropriate, " and Maas was aware of this policy. (Wexler Decl., Ex. P; Maas Tr. 84:08-12.)*

**Plaintiff's Response**
Admitted that Maas was aware of policy but when shown ADA policy during deposition, he testified, "I don't remember seeing this document." (See, Maas Tr. 84:4-7.)

***Defendant's Statement of Fact No. 7***
*During Maas's employment with Verizon, Verizon maintained a Code of Conduct, which Maas received training on throughout his employment. (Wexler Decl., Exs. Q, R.) His most recent training took place on November 4, 2019. (Wexler Decl., Ex. R; Maas Tr. 85:15-22.)*

**Plaintiff's Response**
Admitted.

***Defendant's Statement of Fact No. 8***
*Maas was aware that the Code of Conduct addressed discrimination and harassment, as well as workplace violence, and included the following statement" "We are committed to maintaining a work environment that is free from violence and weapons, or threatening, hostile, or abusive behavior. You must never engage in violent or threatening behavior towards fellow employees, customers, or business partners." (Maas Tr. 80:08—81:05; Wexler Decl., Ex. Q at VERIZON 000054)*

**Plaintiff's Response**
Admitted.

***Defendant's Statement of Fact No. 9***
*Maas was aware throughout his employment with Verizon that it prohibited discrimination and harassment based on a disability and that there was a complaint procedure that enabled him to file a complaint concerning discrimination, harassment or retaliation. (Maas Tr. 81:11-17)*

**Plaintiff's Response**
Admitted that Maas was "aware" that [he] had avenues to complain to, if [he] felt [he was] being discriminated or harassed." (See, Maas Tr. 81:11-17.) Not that Verizon actually prohibited discrimination and harassment based on disability.

3

***Defendant's Statement of Fact No. 10***

*If there is a physical altercation between employees, then Security is in charge of investigating the incident. (Majid Tr. 43:08-12; Browne Tr. 19:13-22; Ferrara Tr. 28:17-19.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 11***

*Based on the findings in the Security Investigation Report, the Labor Relations Specialist will make a disciplinary recommendation. (Ferrara Tr. 18:24-19:04.)  Then, the Area Director will make the final determination. (Ferrara Tr. 20:12-22.)*

**Plaintiff's Response**

Admitted.

**C.      The Union and the Collective Bargaining Agreement**

***Defendant's Statement of Fact No. 12***

*During the entirety of his employment, Maas was a member of the Communication Workers of America union, Local Chapter 1104 (the "Union"). (Maas Tr. 65:21-66:09.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 13***

*During the Relevant Time Period, Maas was subject to a collective bargaining agreement ("CBA") governing wages, overtime, transfers, promotions, discharges and suspensions, the grievance procedure, reinstatements, and work schedules. (Wexler Decl., Ex. S.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 14***

*Article 10 of the CBA governs Discharges, Suspensions and Demotions for Cause and explicitly provides:*

> *Sub-Section 10.01 – "In the event any employee is suspended or discharged for cause, a written claim that the suspension or discharge was without just cause must be filed by the Union …. If an employee is to be discharged, he shall first be suspended for ten (10) calendar days…. During the ten (10) day period, the Local Union may discuss the reasons for the Company's actions with the appropriate district level supervisor (or*

4

*his alternate) and may protest the action…. If an employee with more than six (6) months of net credited service is discharged at the expiration of the ten (10) day suspension period, the Union's claim shall be subject to the grievance and arbitration provisions of this Agreement;"*

*Sub-Section 10.04 – "No Arbitrator shall have power or jurisdiction to modify the Company's action. The Arbitrator shall either find that the Company's action was not without just cause, in which event the suspension, demotion or discharge shall be sustained in full; or that the suspension, demotion or discharge was without just cause, ins which even the treatment of the case shall be set forth in section 10.03 so this Article." (Wexler Decl., Ex. S at VERIZON 000136, 000139.)*

**Plaintiff's Response**
Admitted.

**Defendant's Statement of Fact No. 15**
*Article 11 of the CBA sets forth a three-step grievance procedure for the resolution for disputes arising under the CBA. (Id. at VERIZON 000140-142.)*

**Plaintiff's Response**
Admitted.

**Defendant's Statement of Fact No. 16**
*An employee or shop steward can request a grievance by going to the local manager and asking for a grievance number. (Ferrara Tr. 23:22-25.) The Union stewards and local management would then arrange for grievance meeting to discuss the issue. (Ferrara Tr. 24:04-25:18; O'Shea Tr. 21:03-11.)*

**Plaintiff's Response**
Admitted.

**Defendant's Statement of Fact No. 17**
*Article 12 of the CBA sets forth the arbitration procedures and requires claims referable to arbitration as provided in Articles 8, 9, 10 and 15, including a discharge, be brought pursuant to final and binding arbitration. (Wexler Decl., Ex. S, at VERIZON 000143-145).*

**Plaintiff's Response**
Admitted.

***Defendant's Statement of Fact No. 18***

*During the relevant time period.  Chris O'Shea was the Chief Steward for the Union and represented linemen at the Bethpage garage. (O'Shea Tr., 10:17-11:13.)  Thomas Finn served as the Union's Business Agent.(Finn Tr. 5:19-24; O'Shea Tr. 35:22-23.)  Anthony Ferrara was Verizon's Labor Relations Specialist (Sr. Labor Relations Manager). (Ferrara Tr. 10:03-07.)*

**Plaintiff's Response**

Admitted.

**D.      Supervisors**

***Defendant's Statement of Fact No. 19***

*Edward Orihuela was Maas's supervisor for the 2014 Performance Year. (Wexler Decl., Ex. T.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 20***

*Edward Nuener was Maas's supervisor for the 2015 Performance Year. (Wexler Decl., Ex. U.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 21***

*Richard Kalista was Maas's supervisor and signed his 2016 Associate Year End Review. (Maas Tr. 74:07-13; Wexler Decl., Ex. V.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 22***

*Beginning in 2017, Maas was employed primarily out of the Bethpage garage, which was located at 630 Hicksville Road, Bethpage, New York. (Maas Tr. 62:03-04, 64:13-16, 75:20-21; Francese Tr. 6:02-04.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 23***

*Craig Mjid became Maas's supervisor in late 2017.  Richard Kalista was Maas's supervisor for the majority of the year, and therefore, signed his 2017 Associate Year End Review. (Wexler Decl., Ex. W.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 24***

*Craig Majid was Maas's supervisor and signed his 2018 Associate Year End Review. (Maas Tr. 77:15-20; Wexler Decl., Ex. X; Majid Tr. 26:15-16.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 25***

*Craig Majid was Maas's supervisor and signed his 2019 Associate Year End Review. (Wexler Decl., Ex. II.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 26***

*Craig Majid was Maas's supervisor at the time of his termination. (Maas Tr. 78:20-23.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 27***

*During the Relevant Time Period, Eugene Cimaglia was Maas's Area Operations Manager. (Maas Tr. 76:25-77:02.)*

**Plaintiff's Response**

Admitted.

E.    **Medical Restriction and Accommodation Process**

***Defendant's Statement of Fact No. 28***

*Verizon has a Human Resources Workplace Accommodation Team ("WPAT")  that handles employee requests for an accommodation. (Miller Tr. 15:19-16:13.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 29***

*There are two ways for an employee to submit a request for an accommodation. They could proactively request an accommodation by completing a form and sending it to the WPAT; or if the employee was on a disability leave, the WPAT may receive notice from the disability vendor explaining that someone was requesting an accommodation to return to work after a disability claim. (Miller Tr. 16:16-17:12.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 30***

*If an employee was attempting to return to work after a disability leave, the request typically went from the disability vendor directly to the employee's people leader, requesting that the employee return to work with a specific restriction. The vendor would describe what the restriction is and the people leader would respond to let the Vendor know if there was work that the employee could do with those restrictions. (Miller Tr. 17:25-19:02.)*

**Plaintiff's Response**

Admitted in part, but if there was work with the restrictions there was no specific procedure in place if the people leader had work and informed the disability vendor of the existence of that work. (See, Miller Tr. 18:16-19:02).

***Defendant's Statement of Fact No. 31***

*If a disability vendor in New York, where Maas worked, received a response from a people leader indicating that there was no work for an employee based on their specific restrictions, the vendor would review the disability claim to see if there was a way to continue to approve the disability claim. (Miller Tr. 19:20-20:04.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 32***

*If the request came in through Sedgwick, Sedgwick had already concluded its own independent medical review and determined that the restriction is necessary. Sedgwick's conversations with Verizon are to determine whether the restriction is something the*

*business can accommodate, and if so, the employee would be returned to work with that accommodation. (Miller Tr. 31:06-22.)*

**Plaintiff's Response**

Admitted in part, but whether or not the people leader would reach out to other departments to determine if there was work available there that fit the employee's limitations was not a certainty. (See, Miller Tr. 33:02-11)

***Defendant's Statement of Fact No. 33***

*Employees seeking an accommodation fill out a form, which is provided to the WPAT, and the case would be assigned to a case manager, who would ultimately send the request to Verizon's third-party medical vendor to conduct the medical review, and the case manager would have an interactive dialogue with the employee. (Miller Tr. 20:24-21:08, 26:25-28:16.)*

**Plaintiff's Response**

Denied.  The case manager would not have an interactive session with the employees in all circumstances.  Definitely did not have one with the Plaintiff.  (Majid Tr. 64:9-13; Miller Tr. 20:5-11, 22:25)

***Defendant's Statement of Fact No. 34***

*As of January 2018, Verizon's third-party medical vendor was Sedgwick, which was responsible for reviewing and managing employee disability claims and medical restrictions, making medical determinations as to whether an accommodation request is medically supported by the documentation, communicating with medical providers, and making referrals to WPAT. (Miller Tr. 22:09-12, 24:08-12.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 35***

*If an employee directly submitted the request, they would submit the form provided by WPAT, providing information about who they were, who their people leader was, and what they were looking for, as well as their status as a union or non-union employee. They would also complete a medical authorization and have their medical provider complete a medical questionnaire. (Miller Tr. 26:25-28:16.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 36***

*This information would then be sent to Sedgwick for review.  Sedgwick would respond and confirm whether the medical request was supported – if it was supported, the WPAT would review the accommodation. (Miller Tr. 26:25-28:16.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 37***

*The process of reviewing the accommodation often began with an interactive dialogue with the employee, as well as conversations with the employee's people leader and any other relevant team members. (Miller Tr. 28:17-29:21.)  If the employee was a member of a union, the labor team may have been contacted as well. (Miller Tr. 29:17-21.)*

**Plaintiff's Response**

Admitted

***Defendant's Statement of Fact No. 38***

*If there were no available accommodations, the WPAT team would be informed by the people's leader.  At that time, if Sedgwick determined continued disability was not appropriate, the employee could request an accommodation again directly with WPAT.  In the alternative, they could request an unpaid leave of absence or provide any additional information that may help them return to work.*

**Plaintiff's Response**

Admitted in part, except that if the people leader determined that there was no work that met restrictions and request came from Sedgwick that would not be communicated to the WPAT. (Miller Tr. 35:11-23)

***Defendant's Statement of Fact No. 39***

*Before 2019, Verizon accommodated Maas in recent years in the way of paid medical leaves of absence.  For example, in 2017, Maas suffered a "broken wrist" but received full pay while he was on leave. (Maas Tr. 70:02-71:17.)  In 2018, Verizon accommodated Maas in the way of a paid medical leave of absence covered by Short-Term Disability, from November 1, 2018 – December 2, 2018. (Wexler Decl., Ex. Z.)*

**Plaintiff's Response**

Admitted.

10

***Defendant's Statement of Fact No. 40***

*In all of the above circumstances (SOF ¶39), Maas not only received full pay (Maas Tr. 71:13-17), he also never complained about the accommodations he received, even though he was aware that there were avenues to do so. (Maas Tr. 82:15-22.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 41***

*In April 2019, Maas was injured on the job while reaching for a cable. (Maas Tr. 92:24-93:03).*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 42***

*Due to his injuries, Maas took Workers' Compensation leave from work from April 4, 2019 – September 13, 2019.  While on leave, he received full compensation. (Maas Tr. 93:04-13, 103:19-21.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 43***

*Even though Maas now claims that he was unable to work until September (Maas Tr. 93:04-06), in or around late July or early August 2019, Maas requested to return to work with light duty, specifically no weight handling over 20 pounds and only occasional overhead use of the left arm from August 1, 2019 through September 13, 2019. (Miller Tr. 41:19-42:07, 59:14-24, 118:14-22; Maas Tr. 94:05-10.)*

**Plaintiff's Response**

Denied in part.  Plaintiff was not able to work until September 2019 because he was not accommodated. (Maas Tr. 92:24-93:6)

***Defendant's Statement of Fact No. 44***

*During his deposition, Maas could not recall what restrictions, if any, he had requested before returning to work in September 2019. (Maas Tr. 94:14-20.)*

**Plaintiff's Response**

Admitted.

11

***Defendant's Statement of Fact No. 45***

*Sedgwick sent three emails to Craig Majid, Maas's then manager, seeking Verizon's input as to whether Maas's restrictions could be accommodated on August 1 and 2.* (Miller Tr. 118:09-122:01; *Wexler Decl., Exs. AA, BB, CC.*)

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 46***

*Majid sent email requests to the rest of his team including his immediate supervisor Eugene Cimaglia, to determine if Maas's medical restrictions could be accommodated. Majid was informed that there were no available positions. (Majid Tr. 73:16-25, 76:08-15, 81:03-14; Cimaglia Tr. 90:03-06, 91:16-19; Wexler Decl., Ex. DD.)*

**Plaintiff's Response**

Admitted in part, but the reply email that Eugene Cimaglia received from Paul Petersen only states "Sorry no", with no explanation as to why.  (See, Wexler Decl. Ex. DD)

***Defendant's Statement of Fact No. 47***

*Majid then informed Sedgwick that there was no work available within those restrictions. (Wexler Decl., Ex.EE.)*

**Plaintiff's Response**

Admitted in part, but the email only states "we can not accommodate."  No reasons given, no mention of the restrictions.  (See, Wexler Decl. Ex. EE)

***Defendant's Statement of Fact No. 48***

*Maas's requested accommodations were denied because lifting and climbing are essential functions of the Field Technician role, which could not reasonably be accommodated. (Majid Tr. 65:21-67:20, 77:10-13.)*

**Plaintiff's Response**

Denied.  During his deposition, Majid never states that lifting and climbing are "essential functions" of the Field Technician role.  (See, Majid Tr. 65:21-67:20, 77:10-13)  Also, nowhere in the description of Field Technician job does it state that lifting and climbing are "essential  functions".  (See, Wexler Decl. Ex. N)

***Defendant's Statement of Fact No. 49***

*Specifically, Majid stated:*

*In a crew, everybody that goes out there has to be able to do any part of the job. It's a safety issue. God forbid a pole fall. God forbid something happens. Everybody that's in that crew needs to be able to handle the rucks, the equipment and everything else. We're talking about a safety issue and a life issue. Someone that is not able to do something, and you put them in that crew, and God forbid the other person gets hurt, and this person can't do it. You're putting someone's life in jeopardy. So, no. Even though it's flagging, he still has to be able to be capable of doing all the functions of a line person if he's on that crew, in that street, working on that pole. (Majid Tr. 66:08-21)*

Plaintiff's Response
Admitted, only that it accurately represents Majid's deposition testimony.

**_Defendant's Statement of Fact No. 50_**
*Moreover, even if Maas received his requested accommodation of "flagging," he would not be exempt from the requirements of his position. In fact, even if Maas was "flagging for the day…. And then all of a sudden, [a cowoker says] ["]hey, I need help. I got this thing on my arm. Can you help me lift it?["]. If Maas were to reply, ["]Oh, I can't do that because it's 20 pounds.["] Majid explained that Maas would be "putting the crew in jeopardy when someone is restricted on the functions that they need to do." (Majid Tr. 72:09-15.)*

**Plaintiff's Response**
Denied. Majid did not testify during his deposition that Maas would not have been "exempt" from the requirement of his position if he was flagging. In fact, Majid testified during his deposition that he did not make that determination instead that "[he] guess[ed] Verizon made that determination because [they] don't take people with restricted duty back to work …. [that] this [was] above [his] pay grade. [and that he] only forward[s] it to [his] superiors." (See, Majid Tr. 72:16-22)

**_Defendant's Statement of Fact No. 51_**
*Because Maas's request for light duty was not a reasonable accommodation at the time, Verizon continued to provide Maas with the accommodation of paid leave until he could return to work without medical restrictions. (Maas Tr. 103:19-21)*

**Plaintiff's Response**
Admitted only to the extent Maas received full pay while he was out on leave. (See, Maas Tr. 103:19-21)

13

***Defendant's Statement of Fact No. 52***

*Once Maas returned in September 2019, he had no medical restrictions and was only required to continue with his physical therapy. He did not request an accommodation to his work duties when he returned from leave. (Maas Tr. 94:07-10)*

**Plaintiff's Response**

Admitted that he had no documented medical restriction but, he did request an accommodation. (See, Plaintiff Responses to SOF 55 and 56)

***Defendant's Statement of Fact No. 53***

*One week after returning to work from his injury, on September 23, 2019, Maas injured his right arm while lifting on the job. (Maas Tr. 96:05-21.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 54***

*As a result, Maas was again out of work on leave until November 2019. (Maas Tr. 97:01-06.) Once again, Maas was fully accommodated with full pay during this leave. (Maas Tr. 97:09-11, 99:06-10.)*

**Plaintiff's Response**

Admitted only to the extent that Maas was out of work until November 2019 and that he received full pay during that leave. The term "fully accommodated" is denied. During his cited testimony, Maas never agrees he was "fully accommodated". (See, Maas Tr. 97:09-11, 99:06-10)

***Defendant's Statement of Fact No. 55***

*Although Maas alleges in the Complaint that he requested an accommodation upon his return, in his deposition, Maas could not recall, and there is no record, of him requesting light-duty work following his return from his September 2019 injury. (Maas Tr. 102:2—103:01; Majid Tr. 84:22-25; Cimaglia Tr. 99:22-25.)*

**Plaintiff's Response**

Denied. During his deposition Maas testified that "[he] recall[s] mentioning to [Craig Majid] that [he was] still going through physical therapy …. And that [he] can't do the heavy lifting …. And he just said, 'work it out with your fellow team.'" (See, Maas Tr. 104:08-22) Also, Majid when asked whether Maas told him he would have limitations when he returned in November 2019, he said "I don't recall." (Majid Tr. 84:15-21) And

14

Cimaglia during his deposition stated he did not know if Majid discussed the restrictions with Maas. (See, Cimaglia Tr. 99:06-25)

### *Defendant's Statement of Fact No. 56*

*Rather, Maas "mentioned to [Majid] just when [he] was back" from leave, continuing to go to physical therapy, and may need surgery on his right shoulder, Maas admits that nobody at Verizon made any comments or took any action that would prevent him from undergoing this surgery or physical therapy. (Maas Tr. 105:05-106:01.)*

### **Plaintiff's Response**

Admitted in part, Maas also mentioned that he could not do heavy lifting.  (See, Maas Tr. 104:08-22)

### *Defendant's Statement of Fact No. 57*

*Maas never spoke with Cimaglia regarding any requests for accommodations. (Maas Tr. 102:05-08.)*

### **Plaintiff's Response**

Admitted.

### *Defendant's Statement of Fact No. 58*

*During his employment, nobody made any comments about Maas's injuries that he believed were inappropriate. (Maas Tr. 172:06-10)*

### **Plaintiff's Response**

Admitted.

### *Defendant's Statement of Fact No. 59*

*Maas never filed any complaint alleging he was harassed, discriminated against, or retaliated against because of any protected category before the termination of his employment. (Maas Tr. 81:11-82:06.)*

### **Plaintiff's Response**

Admitted.

**F.    December 19, 2019 Altercation & Immediate Investigation**

### *Defendant's Statement of Fact No. 60*

*On the morning of December 19, 2019, approximately thirty to fifty individuals were in the Verizon Bethpage break room. (Francese Tr. 8:09-14; Downes Tr. 7:23-8:03; Cimaglia Tr. 108:11-14)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 61***

*In the breakroom, there are a line of computers that employees can use. (Hulsen Tr. 9:24-10:2; Majid Tr. 15:21-16:1.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 62***

*As Maas walked into the room, Kurt Downes, Thomas Francese, and Brian Hulsen were sitting next to each other using the computers. (Hulsen Tr. 8:09-11; Francese Tr. 9:05-15; Maas TR. 128:05-14.)  Majid and Cimaglia were standing together nearby. (Maas Tr. 127:08-11; Majid 86:24-25; Cimaglia Tr. 110:18-23.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 63***

*No witness corroborates Maas's contention that Hulsen first pulled a chair out from underneath him, and that they were joking around as old friends." (Maas Tr. 148:10-15; Downes Tr. 8:04-10; Hulsen Tr. 8:08-18; Francese Tr. 7:10-19; Majid Tr. 92-12:18.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 64***

*Multiple witnesses recall observing Maas grabbing Hulsen by the upper chest/neck area, lifting his chair, and throwing him to the ground. (Ferrara Tr. 7:04-22, 12:09-20; Hulsen Tr. 8:14-18; Downes Tr. 7:11-16, 8:06-10; Majid Tr. 87:2, 92:12-25; Cimaglia Tr. 100:24-101:08, 116:14-20; Wexler Decl., Ex. FF.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 65***

*Maas admits that he "pushed with [his] left arm [Hulsen's] left shoulder back so he would lose his balance and fall backwards." (Maas Tr. 129:07-08, 141:10-13.)*

16

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 66***

*Witnesses closest to the situation saw that Hulsen's neck began to bleed immediately after Maas pushed Hulsen to the ground. (Francese Tr. 10:07-08; Downes Tr. 15:10-13; Wexler Decl., Ex. FF.) Maas speculates that this cut is old. (Maas Tr. 116:21-117:04.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 67***

*After seeing the altercation, and with Hulsen lying on the floor, Cimaglia and Majid separated the two individuals and deescalated the situation. (Cimaglia Tr. 119:10-12.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 68***

*Hulsen then left the breakroom to smoke a cigarette. During that time Scott Burns, the Shop Steward, checked to see if Hulsen was ok. (Hulsen Tr. 10:12-11:02.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 69***

*Louis Vanni did not recall witnessing the altercation between Maas and Hulsen and had no knowledge of Maas' 2019 injuries. (Vanni Tr. 7:23-8:02, 9:19-10:03.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 70***

*On December 19, 2019, Verizon's Security team began its investigation into the physical altercation. The Investigator assigned to this investigation was Martin Browne. Browne interviewed Maas and Hulsen, as well as four individuals who witnessed the altercation: Craig Majid, Eugene Cimaglia, Thomas Francese and Kurt Downes. (Wexler Decl., Ex. FF.)*

17

**Plaintiff's Response**
Admitted.

**_Defendant's Statement of Fact No. 71_**
_Pursuant to the CBA, Chris O'Shea and Thomas Finn were present during the witness interviews as representatives of the Union. (Wexler Decl., Ex. GG at VERIZON 000544-548.)_

**Plaintiff's Response**
Admitted.

**_Defendant's Statement of Fact No. 72_**
_During the investigation, Cimaglia reported that Maas grabbed Hulsen "by his upper chest/throat area and threw him to the ground, causing Mr. Hulsen to fall backwards off of the chair." (Wexler Decl. Ex. FF. at p. 2.)_

**Plaintiff's Response**
Admitted.

**_Defendant's Statement of Fact No. 73_**
_During the investigation, Majid reported that he saw Maas "grab Mr. Hulsen near his upper chest/lower neck area with one hand while his other hand grabbed the chair between Mr. Hulsen's legs" and that Maas "threw Mr. Hulsen to the ground causing Mr. Hulsen to fall backwards." (Id.)_

**Plaintiff's Response**
Admitted.

**_Defendant's Statement of Fact No. 74_**
_During the investigation, Hulsen reported that Maas "grabbed him by the neck and threw him to the ground while he was still seated in the chair, " and that as a result, he sustained "a scratch on his neck that he stated was caused by" Maas.  A photograph of the scratch was included in the investigation report. (Id. at pp. 2, 7.)_

**Plaintiff's Response**
Admitted.

**_Defendant's Statement of Fact No. 75_**
_During the investigation, Francese state that Maas "grabbed Mr. Hulsen by his collar and pushed him to the ground while Mr. Hulsen was still in the chair." (Id. at p. 2.)_

18

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 76***

*During the investigation, Downes stated that Maas "lunged at Mr. Hulsen, pushing him to the ground while Mr. Hulsen was still sitting in the chair." (Id.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 77***

*During the investigation, Maas stated that "he pushed Mr. Hulsen to the ground jokingly" and "pushed his shoulder causing the chair and Mr. Hulsen to fall to the ground." When shown a photograph of the scratch on Mr. Hulsen's neck, Maas stated that "the scratch looked old." (Id.; Ferrara Tr. 26:17-20.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 78***

*Following these interviews on December 20, 2019, Security concluded that Maas violated the Code of Conduct, specifically citing the workplace violence section. (Wexler Decl., Ex.FF.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 79***

*After Security finalized the investigation report, Ferrara reviewed the investigation to determine what form of discipline, if any, was recommended. (Ferrara Tr. 17:11-19:04.) Ferrara also considered Maas's disciplinary history and potential other mitigating factors. (Ferrara Tr. 30:03-10.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 80***

*Upon review, Ferrara recommended that Verizon terminate Maas's employment for violating the Code of Conduct, Violence in the Workplace policy. (Wexler Decl., Ex. HH.)*

19

*Ferrara had no knowledge of any of Maas's injuries or requests for accommodation at the time he made this recommendation. (Ferrara Tr. 65:21-66:11.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 81***

*Based on Ferrara's experience, dismissal is recommended for substantiated workplace violence cases "arguably, 100 percent of the time." (Ferrara Tr. 80:03-06.)  In this case, it was "clear cut" because Maas "went to another employee and assaulted him on the job.  It's completely unacceptable behavior.  And the company has a - a long standing intolerance for violence in the workplace. (Ferrara Tr. 35:20-25.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 82***

*Majid was not a decisionmaker regarding the termination of Maas's employment.* (Majid Tr. 88:25-89:02.)

**Plaintiff's Response**

Admitted.

G.    **Termination and Grievances**

***Defendant's Statement of Fact No. 83***

*On January 7, 2020, Verizon informed Maas that he was suspended for ten (10) calendar days pending dismissal for cause. (Wexler Decl., Ex. M.)  Verizon also provided the Union with this notice, pursuant to section 10.01 of the CBA. (Wexler Decl., Ex. GG at VERIZON 000536.)*

Plaintiff's Response

Admitted.

***Defendant's Statement of Fact No. 84***

*Following notification of his pending termination of employment, O'Shea filed a grievance on behalf of Maas. (O'Shea Tr. 76:15-17.)*

**Plaintiff's Response**

Admitted.

20

***Defendant's Statement of Fact No. 85***

*During the grievance process, there were no discussions regarding Maas's 2019 injuries, disabilities or requests for accommodations. (Ferrara Tr. 65:21-66:03)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 86***

*Although Maas states that O'Shea told him that there was nothing to worry about because this was his first offense, O'Shea did not recall any such conversation. (O'Shea Tr. 96:18-97:09.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 87***

*On January 12, 2020, Verizon and the Union agreed to waive the first step and moved directly to the second step. (Wexler Decl., Ex. GG at VERIZON 000534.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 88***

*On January 13, 2020, Finn, O'Shea and Cimaglia conducted the Second Step Review. Employees are not typically at Second Step meetings. On behalf of Maas, O'Shea wrote that Maas only pushed Hulsen in jest and requested that Maas be able to return to work and be moved to another Verizon garage. There was no mention of any disability or injuries. (Wexler Decl., Ex. GG at VERIZON 000532-33.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 89***

*Cimaglia stated that Maas's employment was terminated for his act of workplace violence in violation of the code of Conduct, and as a result, would not be reinstated. The parties then moved to the 3rd Step of the Grievance process, pursuant to the CBA. (Id. at VERIZON 000531.)*

**Plaintiff's Response**

Admitted.

21

**_Defendant's Statement of Fact No. 90_**
_On July 14, 2020, the Union and Verizon attended the third step grievance review. (Id. at VERIZON 000556.)_

**Plaintiff's Response**
Admitted.

**_Defendant's Statement of Fact No. 91_**
_On September 11, 2020, Verizon informed the Union that the grievance was denied. (Id.)_

**Plaintiff's Response**
Admitted.

**_Defendant's Statement of Fact No. 92_**
_On September 18, 2020, Michael Ippoliti, Executive Vice President of the Union, informed Maas that Verizon had denied his grievance and that the Union elected not to proceed further with his case. (Id. at VERIZON 000555).  Ippoliti provided instructions on how to appeal the Union's decision if Maas chose to do so. (Id. at VERIZON 000557-563.)_

**Plaintiff's Response**
Admitted.

**_Defendant's Statement of Fact No. 93_**
_Maas appealed the Union's decision not to submit this grievance to arbitration. (Id. at VERIZON 000564-569.)_

**Plaintiff's Response**
Admitted.

**_Defendant's Statement of Fact No. 94_**
_On October 19, 2020, William Gallagher, Area Director for the Union, sent a letter to Maas that the Union had denied his appeal.  In the Letter, Gallagher notes that "The Union would not be able to convince an arbitrator that you didn't physically grab Mr. Hulsen by the chest and throw him into the ground" and that "other Union members" and "two Verizon managers witnessed the action."  In addition, Gallagher wrote, "In your appeal you mention the real reason for your termination is for absences related to the injuries.  This is not the case.  The termination letter is clear that you were terminated for ... violent behavior in the workplace." (Id. at VERIZON 000570-571)_

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 95***

*On November 4, 2020, Maas emailed the Union again protesting their decision. (Id. at VERIZON 000572-573.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 96***

*On November 24, 2020, Dennis Trainer, Vice President of the Union, again informed Maas that the Union was going to deny his appeal because it was unlikely to be successful in arbitration. (Id. VERIZON 000574-575.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 97***

*After additional pleas to the Union, on January 8, 2021, the Union again denied Maas's appeal. (Id. at VERIZON 000580-81.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 98***

*Maas provides a few alternative theories as to why his employment was terminated. This includes union stewards wanting Verizon to terminate his employment because Maas caught them falsifying overtime records. Although he never witnessed this and was not told this by anyone, he speculates that union stewards told various witnesses to lie about the altercation. He concludes that the Union told Hulsen to lie because an unnamed employee at an unknown time, told Maas that Hulsen was told that either he or Maas would be terminated. (Maas Tr. 145:05-146:01.)*

Plaintiff's Response

Admitted.

23

***Defendant's Statement of Fact No.99***

*Additionally, Maas speculates that Downes lied because he was on a hardship transfer at the Bethpage facility and wanted to secure a permanent transfer. (Maas Tr. 144:19-145:04.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 100***

*Finally, Maas speculates that after he was already terminated, Cimaglia told a Union representative that Maas' employment was terminated because he "got hurt at work too much," even though the Union had already told him that he was not terminated because of his injuries, and was terminated because of his "violent behavior in the workplace." (Wexler Decl., Ex. GG at VERIZON 000570-51.)*

**Plaintiff's Response**

Denied.  Maas testified that Cimaglia told his union representative, Ippoliti that Maas was hurt too much at work.  The union does not determine if and why an employee is terminated. The union was notifying Maas of the official pretextual reason on the paperwork provided to them.  (Maas Tr. 121:3 – 125:8)

H.   **Comparators**

***Defendant's Statement of Fact No. 101***

*Maas alleged in the Complaint, and in prior correspondence to the Union, that "two at [Maas's] former work location had an altercation so sever that two police cars responded to the scene" and that "neither [employee] was terminated." (ECF No. 1 ("Compl."), ¶ 36.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 102***

*However, Maas: (1) did not know when this happened, (2) did not know one of the individual's names; (3) stated that the incident in question was that someone "keyed" the other's car; (4) did not witness the interaction and only heard it from others in the building; and (5) could not confirm that the incident actually took place. (Maas Tr. 150:15-152:08.)*

**Plaintiff's Response**

Denied. Maas testified that it happened in 2018, that one of the employees was named "Lana", that one of the employees, both women was taken into custody by Nassau County Police Officers and that one of them was placed on another tour since both were on the same tour. (Maas Tr. 150:6-152:4)

***Defendant's Statement of Fact No. 103***

*Maas alleged in the Complaint that "[a]nother employee, a splicer, was transferred from a splicer garage to [Maas's] former location (which is a line garage) because of a physical altercation with another employee at a different location. That employee was , upon information and belief, the only splicer driving out of [Maas's] former location." (Compl., ¶ 37.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 104***

*However, Maas does not know who these individuals are, did not witness this alleged incident, did not know when this took place, and when initially asked what the Complaint was referring to, stated, "I don't know." (Maas Tr. 152:09-153:24.)*

**Plaintiff's Response**

Denied in part. The "I don't know" statement was followed by "I'm reading it again" since at the time of questioning he was being asked to review a document put before him. Although he did not recall the person's name, he credibly identified him as the only splicer placed in his garage which is a line garage. (Maas Tr. 152:9-153:24)

***Defendant's Statement of Fact No. 105***

*O'Shea and Majid could not recall any recent confirmed incidents of workplace violence involving physical contact at the Bethpage garage. (O'Shea Tr. 51:24-52:19; Majid Tr. 109:22-110:04.)*

**Plaintiff's Response.**

Admitted.

***Defendant's Statement of Fact No. 106***

*Ferrara recalled two other instances of physical violence throughout his 18-year career at Verizon, and the offending employees were dismissed as well. (Ferrara Tr. 36:15-37:10, 38:07-20.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 107***

*From 2017-2019, Verizon terminated the employment of at least six individuals who Verizon Security found to have violated the workplace violence policy, even where there was no physical contact. (Wexler Decl., Ex. II; Ferrara Tr. 48:25-49:04.)*

**Plaintiff's Response**

Denied.  The documents contained in Exhibit II only show a termination of employment for one individual, Loreen Hayes.  None of the documents therein show a termination for any of the other six individuals.

I.      **EEOC Charge**

***Defendant's Statement of Fact No. 108***

*Maas filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on or about October 14, 2020. (Maas Tr. 123:11-24; Wexler Decl., Ex. JJ.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 109***

*Maas signed and verified the Charge. (Maas Tr. 123:22-24.)*

**Plaintiff Response**

Admitted.

***Defendant's Statement of Fact No. 110***

*Maas acknowledged that in the Charge. he stated that Mr. Cimaglia told him "that the union rep claimed I have gotten hurt at work too much." (Maas Tr. 125:05-08; Wexler Decl., Ex.JJ.)*

**Plaintiff's Response**

Admitted.

***Defendant's Statement of Fact No. 111***

*Verizon filed its response on December 7, 2020. (Wexler Decl., Ex.KK.)*

**Plaintiff's Response**

Admitted.

Dated:  New York, New York
      July 2, 2026

 

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
*Attorneys for Plaintiff*

By: /s/ *Laine A. Armstrong*
    Laine A. Armstrong
225 Broadway Suite 1902
New York, New York 10007
(212) 285-1400
laine@advocatesny.com

27